Filed 6/18/21  P. v. Pangan CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B302799 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA146467) |
| v. | |
| RAMIL MAGLAQUI PANGAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Raul A. Sahagun, Judge.  Reversed and remanded.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Heather M. Clark, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

Ramil Maglaqui Pangan appeals from his judgment of conviction of sexual penetration of an unconscious person (Pen. Code,[1] § 289, subd. (d)) and attempted oral copulation of an unconscious person (§§ 664, subd. (a), 288a, subd. (f)).  Pangan was convicted of the offenses at a second trial after the jury at the first trial was unable to reach a verdict.  On retrial, the prosecution relied on evidence showing that, when confronted with the allegation that he had sexually assaulted the victim, Pangan did not deny it, but rather apologized to the victim for his conduct.  On appeal, Pangan contends the trial court erroneously excluded proffered defense evidence that (1) Pangan said to call the police and have the victim examined by a doctor when he was first told of the allegation, and (2) Pangan's wife directed him to apologize to the victim even if he was not guilty.  The evidence of the wife's complete statement to apologize was admitted at the first trial, but excluded at the second.  We conclude the trial court erred in excluding the proffered evidence, and the error was not harmless.  We accordingly reverse and remand for a new trial.

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

# FACTUAL AND PROCEDURAL BACKGROUND[2]

## I.     The Prosecution Case

### A.     *Pangan's Prior Relationship with the Victim*

Pangan and Vanessa D., the victim in this case, were part of a close-knit group of friends.  Vanessa D. met Pangan through her boyfriend, Carlos C., who worked at a restaurant where Pangan was the head chef and Pangan's wife, Johanna Pangan,[3] was the manager.  Stephen C., Emily B., and a man named R.J. also worked at the restaurant.  The group regularly socialized together outside of work, often at the Pangan residence.  Vanessa D. and Carlos C. were particularly close to the Pangans and visited their home several nights a week.  On other occasions, Carlos C. would drop Vanessa D. off at the Pangan residence in the morning, and Pangan would drive her to her workplace in the afternoon.  Vanessa D. regarded Pangan and Johanna as her second family.

The Pangan residence was a three-bedroom home.  Pangan, Johanna, and their three children occupied one bedroom.  R.J. and Pangan's older uncle shared another room, and a couple with a daughter rented the third room.  The residence also had a converted garage where the men would sometimes congregate to drink.

---

[2] The factual and procedural background is taken from the record of Pangan's second trial.

[3] We refer to Johanna Pangan by her first name for the sake of clarity; we intend no disrespect.

**B.**   *The Sexual Assault*

On the night of July 30, 2017, Vanessa D. and Carlos C. went to the Pangan residence after work. Vanessa D. was about 22 years old at the time. When Vanessa D. and Carlos C. arrived at the residence, they watched television in the living room with Johanna, Emily B., and the Pangan children. After Pangan and Stephen C. arrived from work, the group went to the store and bought a bottle of whiskey. At some point, Carlos C. left and went to his mother's house to play mahjong with his brother and R.J. Pangan, Johanna, Stephen C., and Vanessa D. went to the garage to drink. Vanessa D. drank two to four shots of whiskey that night. She felt tipsy but not drunk. She was wearing denim shorts and a sleeveless shirt with a long cardigan sweater. Pangan was wearing a blue shirt.

Around 1:00 a.m., Vanessa D. left the garage and lay down on a couch in the living room. She covered herself with a blanket and checked her cell phone before falling asleep. Johanna joined Vanessa D. in the living room and slept on another couch about six feet away. The room was dark except for the light emanating from an aquarium near where Vanessa D. was sleeping.

In the early morning hours, Vanessa D. was awakened by a sharp pain in her vagina. She noticed her blanket had been moved, and her shorts and underwear had been pushed to the side. Pangan was sitting on the couch near her feet. He had on the same blue shirt he had been wearing earlier that night. Vanessa D. felt Pangan's fingers inside her vagina. She then saw Pangan "lick" her vaginal area. Pangan next touched her breast over her clothing and kissed her mouth. He then covered her with the blanket. Vanessa D. rolled onto her side with her face

toward the couch and began to cry.  She could not speak because she was in shock and disbelief about what Pangan had done.

A short time later, Carlos C. and R.J. arrived back at the Pangan residence.  Vanessa D. was still lying on the couch in the living room, and she was startled when Carlos C. touched her shoulder to take her home.  As Carlos C. was driving them to their home, Vanessa D. started to cry.  She asked Carlos C., "Was it you?"[4]  Because Vanessa D. continued to sob and seemed afraid, Carlos C. knew something was wrong and began driving back to the Pangan residence.  After Carlos C. repeatedly asked her what happened, Vanessa D. told him that Pangan had touched her.

When they arrived at the Pangan residence, Carlos C. and Vanessa D. remained in the car.  Carlos C. first called R.J. and asked him to come outside.  After telling R.J. what had happened to Vanessa D., Carlos C. asked R.J. to get Johanna.  When Johanna came outside, she sat in the car behind Vanessa D.  While crying, Vanessa D. told Johanna that Pangan had "fingered" her vagina.  Johanna also started to cry.  She asked Vanessa D. if she was sure it was Pangan, and not one of her children or Pangan's uncle.  When Vanessa D. confirmed she saw Pangan's face, Johanna left the car crying and went to find Pangan.  After Johanna left, Stephen C. came outside, and there

---

[4] At trial, Vanessa D. testified that when she asked Carlos C. this question, she was remembering her assailant's blue shirt, which caused her to think Carlos C.'s shirt was blue even though it was actually gray.  Vanessa D. explained that, in that moment, she could not accept that anyone else would have touched her body.

was a discussion about whether to call the police. While Carlos C. and R.J. wanted to report the incident to the police immediately, Stephen C. asked Vanessa D. not to do so. At that time, Vanessa D. did not want to involve the police because she was concerned about the possible immigration consequences for the Pangan children.

At Stephen C.'s suggestion, Carlos C. and Vanessa D. spent the next few days at his residence. Although Stephen C. told them he would help them file a police report, he also asked Vanessa D. to talk to Johanna before taking any action. About two days after the incident, Johanna met with Vanessa D. at Stephen C.'s house. When Vanessa D. told Johanna that she intended to report the incident, Johanna replied, "Okay, then go, Vanessa. Whatever your decision is, there is really nothing that we can do about it." After talking with Vanessa D., Johanna assured Carlos C. she would support them if they decided to contact the police. Johanna also hugged Carlos C. and asked for his forgiveness.

Over the next few days, Vanessa D. was too distraught to eat, sleep, or work. Later that week, she attended a local fair with Carlos C., Johanna, Stephen C., and Emily B. Although Vanessa D. was hoping to return to a sense of normalcy, she realized she could not because of what Pangan had done to her. About one to two weeks after the incident, Vanessa D. went to the hospital to see if she could undergo a sexual assault exam. She was told, however, that an exam would not provide evidence of a sexual assault after a 24-hour period. While at the hospital, Vanessa D. met with a sheriff's deputy and reported the sexual assault at that time.

### C.    *Pangan's Subsequent Apologies*

On August 5, 2017, prior to Vanessa D.'s police report, Pangan sent her a Snapchat message, stating, "Vane I'm sorry already I'm begging you please have pity on me and on my kids I wish I could be the one to take the punishment I'll do anything please I really didn't mean it about what happened . . . just please . . . I'm just going to leave here or if you want me to disappear from this earth Please vane Have pity on me Please allow me first to say goodbye to them please." Vanessa D. showed the message to Carlos C., who took a screenshot of it with his cell phone. While Vanessa D. did not respond to the message, she remained worried that the Pangan children could be deported if she contacted the police.

At some point before Vanessa D. reported the incident to the police, Stephen C. and Emily B. arranged for Carlos C. and Pangan to meet at the Pangan residence. Johanna, Stephen C., and Emily B. were also present at the meeting. Pangan apologized to Carlos C. and asked for his forgiveness. He said he should be given a chance to change because of his children. He urged Carlos C. to physically hurt him rather than file a police report, and stated he would not fight back. When Carlos C. left the meeting, Pangan ran after him and continued to apologize. Pangan also offered to pay Vanessa D. the amount of her salary while she was unable to work.

On September 20, 2017, after Vanessa D. reported the incident, the police arranged for her to conduct a pretext call with Pangan. During the call, Vanessa D. told Pangan she had been to counseling. She said she wanted peace of mind, and wanted to ask him about what he "almost did to" her. Pangan responded, "I really can't, you know, Vane, what I really

7

did.  No, I really don't know what, so. . . ."  Vanessa D. told Pangan that she saw him that night, and that he "fingered" and "licked" her "private part" while she was asleep.  Pangan replied, "That's why if I had done that, I'm really sorry and I'm begging you."  When Vanessa D. reminded Pangan that Carlos C. was his friend, Pangan stated, "I guess I was just carried away by . . . I really didn't, I really didn't mean to do it, if I had done that.  That's why it's also difficult for me to . . . .  That's why now. . . ."  Pangan continued, "I can't for the life of me figure out why it happened.  That's why I'm thinking I no longer want to be, you know, if that's what I have done.  So now even [Johanna] and I might separate because it's not. . . I don't want to, you know . . . I might also leave California because there is . . . again, I'm, you know, that's why . . . .  I don't know if I'm going back to the Philippines or what.  If I had done that, please forgive me.  I really can't fully figure out, you know . . . that's why I'm sorry for that.  I'm really, really, really sorry."

Vanessa D. told Pangan that she thought of him as her family, and she could no longer work because she felt so miserable.  Pangan again apologized, stating, "That's why I'm really sorry if, you know . . .  That's all I can really do right now.  I also miss all of you, our, you know. . . I thought, 'Why so?' Maybe it's just because of, you know . . . but I really didn't mean to do it, if I had done that.  I also really want, you know, peace of mind.  And now there's another one.  That's why I told [Johanna], Maybe I just really need to leave all of you for now.  I'm also becoming, you know.  Maybe I've really become . . . bad or something.  I don't know."  Later in the conversation, Pangan added, "I knew it was bad, but I did it anyway.  I really cannot accept it.  I'm also suffering.  I also don't want, you know. . . .  I

also really don't know. That's why when I talked to [Carlos C.] I told him, Do it to me, do whatever you want to do to me, because I'm also suffering." When Vanessa D. stated that she was "suffering more," Pangan replied, "So it is."

## II. The Defense Case

Johanna, Stephen C., and Emily B. testified for the defense. On the night of July 30, 2017, Vanessa D. poured shots of whiskey for the group of friends gathered in the garage, and they each took turns drinking shots. Vanessa D. consumed five to six shots. Emily B. was in the living room when Vanessa D. and Johanna came inside. Vanessa D. asked Emily B. why she had not joined the group, and then added, "Look now, we are drunk." Emily B. left the Pangan residence shortly after she spoke with Vanessa D. She noticed Vanessa D. was wearing "very tight" mid-thigh jean shorts, which were different from the shorts that Vanessa D. had testified she was wearing that night.

On the night of July 30, Pangan was wearing a blue shirt. Johanna recalled that Pangan's uncle was also present in the home that night and wearing a blue shirt. Early the next morning, Johanna was awakened by R.J. When Johanna came outside, Vanessa D. was crying. Carlos C. spoke first and said that someone had "fingered" Vanessa D. He asked Vanessa D. to tell Johanna who had done so. When Vanessa D. did not initially respond, Johanna asked, "Was it my children?" Vanessa D. continued to cry as she told Johanna that it was Pangan. Johanna also began to cry. She got out of the car and went to the garage to "confront" Pangan. Johanna later told Pangan to "ask for forgiveness."

On the morning of July 31, Stephen C. was awakened when Johanna came into the garage. He then went outside to talk to

9

Carlos C. and Vanessa D.  Because Vanessa D. was crying and wanted to leave, Stephen C. said they should go home, rest, and talk again later.  Later that morning, Stephen C. saw Pangan's uncle leave for work, and he noticed the uncle was wearing a blue shirt.  Stephen C. invited Carlos C. and Vanessa D. to his residence that afternoon so that they could relax and think about what they wanted to do.  He never suggested that they should not report the incident to the police.  During the meeting between Carlos C. and Pangan about the incident, Stephen C. told Pangan to talk to Carlos C. and "just apologize."

Both Stephen C. and Emily B. testified they had never seen Pangan mistreat women or display a sexual interest in Vanessa D.  Johanna testified that, prior to the incident, Vanessa D. would spend time alone with Pangan in the family's residence, and she never complained about Pangan making unwanted sexual advances toward her.

## III.  Jury Verdict and Sentencing

At the first trial, the jury was deadlocked seven to five in favor of Pangan's guilt, and the court declared a mistrial.  At the second trial, the jury found Pangan guilty of sexual penetration of an unconscious person (§ 289, subd. (d)) and attempted oral copulation of an unconscious person (§§ 664, subd. (a), 288a, subd. (f)).  The trial court sentenced Pangan to a term of three years on the sexual penetration count and a concurrent term of 18 months on the attempted oral copulation count.  The court also imposed a $300 restitution fine (§ 1202.4, subd. (b)), an $80 court operations assessment (§ 1465.8), a $60 criminal conviction assessment (Gov. Code, § 70373), and a $300 sex offender fine with penalty assessments and a 20 percent surcharge (§ 290.3).

Pangan timely appealed.

# DISCUSSION

On appeal, Pangan challenges two of the trial court's evidentiary rulings. First, Pangan contends the court erred in excluding testimony that, when Johanna first confronted him with Vanessa D.'s sexual assault allegation, Pangan said to call the police and have Vanessa D. examined by a doctor. Second, Pangan asserts the court erred in excluding testimony that Johanna told him to apologize even if he did not commit the sexual assault to avoid the involvement of the police and the potential impact on their children. Pangan argues the proffered testimony should have been admitted because it was not hearsay, and it was relevant to showing that his subsequent apologies were not admissions of guilt. In addition to these evidentiary error claims, Pangan contends the trial court erred in imposing various fines and fees at sentencing without determining his ability to pay.

## I. Exclusion of Pangan's Statement to Call the Police and Have Vanessa D. Examined by a Doctor

We first consider the admissibility of Pangan's statement to call the police and have Vanessa D. examined by a doctor when Johanna confronted him with the sexual assault allegation the morning of the incident. We conclude the trial court erred in excluding the proffered testimony because it was not hearsay, and it was relevant to refuting the People's theory that Pangan failed to deny the allegation when he was confronted with it.

### A. *Relevant Background*

At trial, the defense sought to elicit testimony from both Stephen C. and Johanna that, when Johanna first confronted

11

Pangan in the garage the morning of the incident, Pangan initially responded to Vanessa D.'s sexual assault allegation by stating "call the cops, have her checked out by a doctor."

The prosecutor first objected to this line of questioning on hearsay grounds during Stephen C.'s testimony, and the trial court sustained the objection. In a sidebar conference, the court rejected defense counsel's argument that the proffered evidence was admissible to show Pangan's then-existing state of mind. The court stated that "his proclamation that he is innocent or [he] thought that he's innocent is still . . . a declaration by him, which can be offered by an adverse party, but not by him." The court also noted that the statement must be relevant to be admissible, and that "the only relevance of [Pangan's] state of mind that he believes he's not guilty is that he's not guilty." Defense counsel argued the statement was not hearsay because it was not being offered to prove that Pangan actually "wanted [Vanessa D.] to go to the cops to be checked out." The court replied, "The gist of that conduct is that he wanted her to do things that [are] consistent with him being innocent. He's saying, 'I didn't do it' because nobody in their right mind would tell a victim to go to the cops if they thought they were guilty."

When Stephen C.'s testimony resumed, the trial court permitted defense counsel to ask whether Johanna confronted Pangan the morning of the incident and what her demeanor was at the time. The court did not allow counsel to ask Stephen C. what was said during that confrontation.

During Johanna's testimony, the trial court again considered the admissibility of Pangan's statement about calling the police and having Vanessa D. medically examined. Defense counsel argued the statement was not hearsay because it was

12

circumstantial evidence of Pangan's state of mind. While the court agreed the statement was evidence of Pangan's state of mind, it noted that his state of mind "is irrelevant." The court explained, "Whether he believes he is guilty or not is of no moment and that's what the evidence is. . . . It is circumstantial evidence [of] his state of mind and his state of mind being that he is innocent, that he didn't do it, whether he believes he is innocent or not, is just not relevant." The court ruled that defense counsel could elicit testimony from Johanna that she confronted Pangan, but not Pangan's response.

When Johanna's testimony resumed, defense counsel asked her, "Did you confront—yes or no, did you confront [Pangan] with what you heard?" Johanna answered, "Yes, sir." On cross-examination, the prosecutor asked Johanna whether it was true that she "didn't want the police coming to [her] house." Johanna responded that she did not want "that to happen because of the children, but on that night, [Pangan] told [her], why don't you call the police." The prosecutor objected to Johanna's response, and the trial court sustained the objection "as to what [Pangan] told her."

### B.    *The Trial Court Erred in Excluding Pangan's Statement to Call the Police and Have Vanessa D. Examined by a Doctor*

Pangan argues the trial court erred in excluding his statement to Johanna to "call the cops, have [Vanessa D.] checked out by a doctor" because it was not hearsay, but rather was a request or command that was not offered to prove the truth of the matter asserted. Pangan also contends the statement was relevant to demonstrating his consciousness of innocence because a guilty person would not have responded to a sexual assault

13

allegation by suggesting that the victim's claim should be investigated. The People argue the trial court properly excluded the statement as inadmissible hearsay because it contained an implied assertion of fact that Pangan did not commit the sexual assault. The People further assert that, even if the statement was nonhearsay, the trial court did not abuse its discretion in excluding it because any slight probative value of the statement was substantially outweighed by the potential for prejudice.[5]

"We review evidentiary rulings, including ultimate rulings on whether evidence should be excluded as hearsay, for abuse of discretion." (*People v. Caro* (2019) 7 Cal.5th 463, 503.) Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Unless subject to an exception, hearsay evidence is inadmissible. (*Id.*, subd. (b).)

A request or command generally is "not hearsay, but 'simply verbal conduct' consisting of a proposal to perform an

_____

[5] In addition to arguing that the trial court's ruling was correct on the merits, the People contend that Pangan forfeited his claim that the statement did not assert the truth of any fact because he failed to raise this argument in the trial court. We disagree. At trial, defense counsel argued that the statement was not hearsay because it was not being offered to prove the truth of the matter asserted. This was sufficient to preserve Pangan's claim that the statement did not assert the truth of any fact within the meaning of the hearsay rule. (See *People v. Partida* (2005) 37 Cal.4th 428, 436 [as "a general matter, no useful purpose is served by declining to consider on appeal a claim that merely restates, under alternative legal principles, a claim otherwise identical to one that was properly preserved"].)

14

act." (*People v. Cowan* (2010) 50 Cal.4th 401, 472.) As our Supreme Court has explained, we "have often characterized commands not as hearsay but rather as 'simply verbal conduct consisting of a directive that was neither inherently true nor false.' " (*People v. Clark* (2016) 63 Cal.4th 522, 592; see *People v. Curl* (2009) 46 Cal.4th 339, 362 [instruction to get rid of a pair of boots "was not hearsay but simply verbal conduct consisting of a directive that was neither inherently true nor false"]; *People v. Jurado* (2006) 38 Cal.4th 72, 117 ["request for the gun, by itself, was not hearsay"].) "Because a request, by itself, does not assert the truth of any fact, it cannot be offered to prove the truth of the matter stated." (*Jurado*, at p. 117.)

A statement which does not directly declare a mental or emotional state but is merely circumstantial evidence of the declarant's then existing state of mind, is also not hearsay. (*People v. Dalton* (2019) 7 Cal.5th 166, 232; *People v. Cox* (2003) 30 Cal.4th 916, 962, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Such evidence " 'is not received for the truth of the matter stated, but rather whether the statement is true or not, the fact such statement was made is relevant to a determination of the declarant's state of mind.' " (*Cox*, at p. 962.) Circumstantial evidence of a declarant's state of mind can be offered for the nonhearsay purpose of showing consciousness of innocence or guilt. (*People v. Cowan*, *supra*, 50 Cal.4th at p. 472; *People v. Curl*, *supra*, 46 Cal.4th at p. 362.)[6]

---

[6] "[C]ase law . . . [citation], describes two different theories under which statements of a declarant's present state of mind can be admitted: (1) as hearsay under the Evidence Code section 1250 exception for the declarant's present state of mind, and (2) as nonhearsay circumstantial evidence of a declarant's state of

On the issue of whether Pangan's statement constituted inadmissible hearsay, *People v. Cowan*, *supra*, 50 Cal.4th 401, is particularly instructive. In *Cowan*, defense counsel sought to introduce evidence that the defendant had offered to " 'come down right now' " to speak with a detective about a murder case in which he was a prime suspect. (*Id*. at p. 472.) The trial court excluded the evidence on the ground that it was not probative of the defendant's state of mind at the time of the murders and was therefore not relevant. (*Ibid*.) On appeal, the defendant argued the proffered evidence was nonhearsay circumstantial evidence of his mental state and was relevant to show consciousness of innocence. (*Ibid*.) The Supreme Court agreed the defendant's offer to speak with the detective "was not hearsay but 'simply verbal conduct' consisting of a proposal to perform an act, and therefore was 'neither inherently true nor false.' [Citation.] Furthermore, the statement was 'offered for the nonhearsay purpose of demonstrating consciousness of' innocence." (*Ibid*.)

Although the *Cowan* court concluded the proffered statement was not hearsay, it nevertheless held that the trial court did not abuse its discretion in excluding such evidence. (*People v. Cowan*, *supra*, 50 Cal.4th at p. 472.) The court cited a line of cases holding that evidence that the defendant "did not flee from a crime scene is inadmissible to show consciousness of innocence, even though such evidence has 'some "tendency in

mind." (*People v. Clark*, *supra*, 63 Cal.4th at pp. 590–591, fn. omitted.) In this case, we consider only the latter theory because Pangan's statement to "call the cops, have her checked out by a doctor" did not directly assert his state of mind, but rather was circumstantial evidence of it.

16

reason" to prove this fact.' " (*Ibid*.)  As the court explained, "the inferences arising from evidence of the absence of flight are ambiguous because 'there are plausible reasons why a guilty person might also refrain from flight,' such as fear of recapture or confidence that flight will be unnecessary because there is no strong proof of guilt.  [Citations.]  Moreover, such evidence also creates a 'substantial danger "of confusing the issues, or of misleading the jury." ' " (*Id*. at pp. 472–473.)

The *Cowen* court applied the same reasoning to the defendant's offer to speak to the police, stating that "other consciousness of innocence evidence, such as defendant's offer here, although relevant, properly may be excluded on the ground that its slight probative value is outweighed by the risk of confusing the issues." (*People v. Cowan*, *supra*, 50 Cal.4th at p. 473.)  The court observed that there were "numerous plausible reasons why a guilty person might offer to talk to the police," such as a desire to appear innocent or a desire to lie to the police to deflect suspicion or to present a false alibi.  (*Ibid*.)  The court concluded that "[a]gainst such slight probative value, the risk of confusing the issues or of delaying the trial is strong, since . . . the prosecution would have to be given the opportunity to explain the circumstances surrounding the defendant's offer and to present evidence negating an inference of innocence." (*Ibid*.)

Like the proffered evidence in *Cowan*, Pangan's statement to "call the cops, have [Vanessa D.] checked out by a doctor" was not hearsay.  Rather, the statement was " ' verbal conduct' " consisting of a directive or request to perform an act, and thus, was " 'neither inherently true nor false.' " (*People v. Cowan*, *supra*, 50 Cal.4th at p. 472.)  Moreover, Pangan offered the

17

statement as circumstantial evidence of his state of mind at the time Johanna confronted him in the garage with Vanessa D.'s allegation. In particular, the defense sought to introduce the statement to support an inference that Pangan was innocent because a guilty person would not respond to a sexual assault accusation by proposing the involvement of the police or a forensic exam of the victim. Therefore, as in *Cowan*, the statement was " 'offered for the nonhearsay purpose of demonstrating consciousness of' innocence." (*Ibid.*)

As the Supreme Court observed in *Cowan*, even if nonhearsay, consciousness of innocence evidence is subject to exclusion under Evidence Code section 352 because the inferences arising from such evidence are ambiguous, and any minimal probative value may be outweighed by the risk of confusing the jury or causing an undue consumption of time. (*People v. Cowan, supra*, 50 Cal.4th at pp. 472–473.) Here, there are plausible reasons why a guilty person would have responded to a sexual assault accusation by saying to call the police and have the victim submit to a forensic exam. Pangan may have wished to deflect suspicion from himself and appear innocent in the eyes of his wife, who was panicked and crying as she confronted Pangan with Vanessa D.'s allegation. Pangan also may have been confident that Vanessa D. would not want to contact the police given her close relationship with his family, or he may have believed a forensic exam would not yield evidence directly connecting him to the assault.

Unlike other consciousness of innocence evidence, however, Pangan's response when first confronted with the sexual assault allegation was also relevant to disproving the People's theory that his failure to deny the allegation was an admission of guilt.

18

Over a defense objection, the trial court granted the prosecutor's request to give the jury an instruction on adoptive admissions.[7] The prosecutor's theory was that Pangan had the opportunity to deny Vanessa D.'s allegation on three separate occasions: (1) in his Snapchat message to her; (2) in his subsequent meeting with Carlos C.; and (3) in the pretext call with Vanessa D. arranged by the police. The prosecutor asserted that, because Pangan did not deny the allegation on any of these occasions, the jury could regard his lack of a denial as an admission.

In her closing argument, the prosecutor highlighted the adoptive admissions instruction, telling the jury that "this is a big one that I want you to really focus on." In describing the instruction, the prosecutor stated that "when somebody accuses you of something heinous, . . . [¶] [a]ny reasonable person would say, No, I didn't do that." She then argued to the jury that

---

[7] The trial court instructed the jury on adoptive admissions with CALCRIM No. 357: "If you conclude that someone made a statement outside of court that accused the defendant of the crime or tended to connect the defendant with the commission of the crime and the defendant did not deny it, you must decide whether each of the following is true: [¶] 1. The statement was made to the defendant or made in his presence; [¶] 2. The defendant heard and understood the statement; [¶] 3. The defendant would, under all the circumstances, naturally have denied the statement if he thought it was not true; [¶] AND [¶] 4. The defendant could have denied it but did not. [¶] If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true. [¶] If you decide that any of these requirements has not been met, you must not consider either the statement or the defendant's response for any purpose."

Pangan had an opportunity on three occasions to say he "didn't do this," and "yet, he never does." Thus, after successfully obtaining the exclusion of testimony that Pangan first responded to Vanessa D.'s sexual assault allegation by stating it should be investigated, the prosecutor misled the jury by stressing the purported absence of a response denying the allegation as evidence of Pangan's guilt. (See *People v. Daggett* (1983) 225 Cal.App.3d 751, 758 [prosecutor compounded error in exclusion of evidence by asking "the jurors to draw an inference that they might not have drawn if they had heard the evidence the judge had excluded"]; *People v. Varona* (1993) 143 Cal.App.3d 566, 570 [prosecutor misled jury when he "not only argued the 'lack' of evidence where the defense was ready and willing to produce it," but "compounded that tactic by . . . arguing a falsehood" contradicted by the excluded evidence].)

Given the People's theory that Pangan's lack of a denial could be considered an admission of guilt, his statement to "call the cops, have [Vanessa D.] checked out by a doctor" was highly probative of how he actually responded when told of Vanessa D.'s accusation. The prosecutor implied in her closing argument that Pangan was silent when confronted with the allegation that he had sexually assaulted Vanessa D. because he had multiple opportunities to deny it and he never did. Admission of the proffered evidence would have shown that Pangan was not in fact silent, but rather told Johanna the morning of the incident, when first faced with the accusation, to call the police and have Vanessa D. submit to a forensic exam. Accordingly, Pangan's statement was not merely evidence of consciousness of innocence, which, as *Cowan* discussed, is often too ambiguous and susceptible to conflicting interpretations to be admissible.

20

Rather, Pangan's statement was also relevant to demonstrating that, whether guilty or not, he did not fail to deny Vanessa D.'s sexual assault allegation when he was confronted with it. Under these circumstances, we conclude the probative value of Pangan's response to the sexual assault allegation was not substantially outweighed by its possible prejudicial effects. The court therefore erred in excluding the proffered statement.

## II. Exclusion of Johanna's Statement to Pangan to Apologize Even if He Was Innocent

We next consider the admissibility of Johanna's statement to Pangan to apologize even if he was not guilty because she wanted to avoid any police involvement and its possible impact on their children. We conclude the trial court erred in excluding Johanna's complete statement because it was not hearsay, and it was relevant both to explaining Pangan's subsequent conduct in apologizing to Vanessa D. and to evaluating Johanna's credibility.

### A. *Relevant Background*

During the direct examination of Johanna, defense counsel sought to introduce the following portion of Johanna's testimony from the first trial: "I told [Pangan] to end all this and do not do anything. If you did not do anything, would you kindly just ask for forgiveness so we can all forget this. . . . I was thinking that these people are—will affect my children. I don't want the police to go to our house."

In a sidebar conference, the prosecution objected to the proffered testimony on hearsay grounds, arguing that the defense was offering Johanna's out-of-court statement to Pangan for its truth. While the court expressed concern that the defense "wants

21

to offer it for that purpose," it also noted that Johanna's request to Pangan to apologize could be admissible for the nonhearsay purpose of explaining "why [Pangan] did what he did."  The court stated that it would not allow testimony on Johanna's reasons for telling Pangan to apologize, and that it would consider the rest of the proffered testimony after further research.  The court later indicated that it had ruled that defense counsel could ask Johanna if she told Pangan to apologize.

On redirect, defense counsel attempted to ask Johanna if she told Pangan "to end all this even if you did not do [it]."  The trial court interrupted, stating, "We talked about it at side bar.  Did she tell him to ask for forgiveness, something to that effect, that's what we talked about."  Defense counsel then asked Johanna if she told Pangan to "ask for forgiveness."  When Johanna answered in the affirmative, defense counsel followed up by asking, "Even if he didn't do it?'  The trial court sustained the prosecutor's objection, noting that they had "talked about this at side bar" and "[t]hat's not permitted."

The following day, outside the presence of the jury, defense counsel argued that he should have been allowed to ask Johanna whether she told Pangan to apologize even if he did not commit the assault.  The trial court explained that Johanna's statement directing to Pangan to apologize "could be used for the purpose of explaining his conduct," but "her motivation as to why she made that statement" was not admissible.  Defense counsel asserted that a statement to apologize did not have the same meaning as a statement to apologize even if he did not do it.  In response, the court stated, "But when you provide that evidence as to whether [he] did it or not, that's explaining why she was making that statement and the only purpose of that statement is to explain

22

his conduct and his conduct is that he apologized. [¶] Now, he may apologize because he did it, he may apologize because he didn't do it and he just wants to end the thing. Those are two explanations and I don't know which one is correct. The only one who knows that is the defendant."

### B. *The Trial Court Erred in Excluding Johanna's Complete Statement to Pangan to Apologize Even If He Was Innocent*

Pangan contends that Johanna's statement to him to "just ask for forgiveness" even "[i]f [he] did not do anything" was not hearsay because it was not offered for the truth of the matter asserted, but rather to explain how he reacted upon hearing such statement. Pangan also argues that the statement was relevant because it had a tendency in reason to prove that his subsequent apologies were not admissions of guilt, but instead were made because his wife instructed him to do so. The People assert that the trial court properly excluded the portion of Johanna's statement that Pangan should apologize even if he "did not do anything" because it was irrelevant, and because any probative value was substantially outweighed by the probability that its admission would confuse the issues or mislead the jury.

It is well-established that "an out-of-court statement can be admitted for the nonhearsay purpose of showing that it imparted certain information to the hearer, and that the hearer, believing such information to be true, acted in conformity with such belief." (*People v. Montes* (2014) 58 Cal.4th 809, 863.) " ' "The statement is not hearsay, since it is the hearer's reaction to the statement that is the relevant fact sought to be proved, not the truth of the matter asserted in the statement." ' " (*People v. Livingston* (2012) 53 Cal.4th 1145, 1162; accord, *People v. Bell* (2019) 7 Cal.5th 70,

23

100.) The nonhearsay purpose of the statement "must also be relevant to an issue in dispute." (*Montes*, at p. 863.)

Here, Johanna's statement to Pangan to apologize even if he was not guilty was admissible for the nonhearsay purpose of showing that Pangan reacted to such statement by apologizing to Vanessa D. and Carlos C. in their subsequent communications. Pangan's purpose in making these apologies was directly relevant to a disputed issue at trial, namely whether or not Pangan was admitting guilt by apologizing and asking for forgiveness. The People's theory was that Pangan's apologies were admissions of guilt because an innocent person would not say he was sorry and ask for forgiveness when accused of a sexual assault. Evidence that Johanna asked Pangan to apologize even if he "did not do anything" would tend to show that Pangan was not apologizing because he was guilty. Rather, Pangan was apologizing because his wife wanted him "to end all this" regardless of his innocence or guilt to avoid any police involvement with the family and the potential negative consequences for their children.

In excluding the words "[i]f you did not do anything" from the portion of Johanna's statement that was admitted, the trial court reasoned that such words explained Johanna's motive for making the statement rather than Pangan's reaction to it. However, the excised portion of the statement was also relevant to explaining why Pangan would have apologized and asked for forgiveness even if he did not commit the sexual assault. As our Supreme Court has observed, the " 'circumstances under which [an] admission was made are also admissible to place the statement in context.' " (*People v. Brown* (2014) 59 Cal.4th 86, 104.) Johanna's request to Pangan to apologize even if he "did not do anything" placed his subsequent apologies in context

24

by demonstrating that Pangan may have had other reasons for apologizing that were unrelated to consciousness of guilt.

Additionally, Johanna's reasons for asking Pangan to apologize were relevant to assessing the credibility of her testimony. While the jury heard evidence that Johanna told Pangan to "ask for forgiveness," it was precluded from hearing why she made this request. Without any explanation or context for Johanna's statement, the only reasonable inference that could be drawn from the evidence was that Johanna asked Pangan to apologize because she believed he was guilty. Admission of the complete statement, however, would have shown that Johanna may have had other reasons for telling Pangan to apologize that had nothing to do with her belief in his innocence or guilt. Such evidence was probative of Johanna's state of mind at the time of the statement and was relevant to her credibility as a witness.

The People contend that the "[i]f you did not do anything" portion of Johanna's statement was ambiguous because it was susceptible to two interpretations. It could express either her suspicion that Pangan was guilty of the sexual assault, or her conviction that Pangan was innocent but should apologize for other reasons. As Pangan correctly points out, however, any ambiguity in the proffered testimony " 'concerns only the weight of this evidence, not its admissibility, which does not require complete unambiguity.' " (*People v. Young* (2019) 7 Cal.5th 905, 927.) Admission of Johanna's complete statement would have allowed the jury to decide the meaning and import of her words and how they may have impacted Pangan's subsequent conduct.

In sum, Johanna's statement directing Pangan to "ask for forgiveness" even if he "did not do anything" was not hearsay and was relevant to a central disputed issue in the case. Moreover,

25

permitting Johanna to testify that she told Pangan to apologize even if he was innocent and to explain her reasons for doing so was not likely to confuse the issues, mislead the jury, or require an undue consumption of time. Under these circumstances, the trial court erred in excluding the proffered testimony.

## III. The Error in Excluding the Proffered Evidence Was Not Harmless

The erroneous exclusion of evidence does not require reversal except where the error caused a miscarriage of justice. (Evid. Code, § 354.) A " 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836; see *People v. Richardson* (2008) 43 Cal.4th 959, 1001.) Here, the prosecution's case against Pangan primarily was comprised of two types of evidence: (1) Vanessa D.'s clear and consistent identification of Pangan as her assailant; and (2) Pangan's subsequent apologies for the assault, which the prosecution argued were admissions of guilt.

As the People contend on appeal, Vanessa D.'s testimony provided compelling evidence of Pangan's guilt. Pangan was not a stranger to Vanessa D. or a mere acquaintance, but rather was a close friend with whom she spent a significant amount of time. Vanessa D. testified unequivocally at trial that she saw Pangan's face during the assault, and he was the person who digitally penetrated her vagina and then orally copulated her. Vanessa D. also identified Pangan as her assailant when she disclosed the assault to Carlos C. as they were driving home and to Johanna after they returned to the Pangan residence.

26

The prosecution did not, however, rely solely on Vanessa D.'s identification of Pangan to prove he was the perpetrator. Rather, the prosecution also relied heavily on Pangan's failure to deny the sexual assault allegation and his subsequent apologies to Vanessa D. and Carlos C. to demonstrate his consciousness of guilt. In her closing argument, the prosecutor contended that Pangan would have denied the allegation when confronted with it if he were innocent, and that he admitted his guilt when he (1) apologized to Vanessa D. in the Snapchat message, (2) apologized to Carlos C. in their meeting at the Pangan residence, and (3) apologized to Vanessa D. in their pretext call. Indeed, the prosecutor argued to the jury that "[t]hose admissions [were] so over the top" that "it's his guilt . . . seething out of him." The prosecutor also repeatedly asserted that Pangan would not have apologized if he did not commit the charged acts. At one point, the prosecutor told the jury, "Yeah, he's saying sorry, but think about it. Common sense, ladies and gentlemen. If you did nothing, what are you sorry about, right? Why would you say, sorry if you didn't do it. That makes no sense at all." Yet as the prosecutor was well aware, there was another explanation for why Pangan might have apologized even if he did nothing wrong, which the jury was unable to consider due to the erroneous exclusion of Johanna's complete statement. The prosecutor was therefore able to capitalize on the trial court's error by urging the jurors to draw an inference about the apologies that they might not have otherwise drawn had they heard the excluded evidence. (*People v. Daggett*, *supra*, 225 Cal.App.3d at p. 758; *People v. Varona*, *supra*, 143 Cal.App.3d at p. 570.)

Additionally, in her closing argument, the prosecutor argued that Johanna's statement to Pangan to apologize showed that she knew "exactly what the defendant did" and was "trying to . . . diffuse everything." The prosecutor told the jury: "But think about it. If your husband or spouse was accused of something, you would be like, what are you talking about? My husband didn't do that. You're crazy, lady. You know, we let you into our house. . . . [W]e drink with you, we let you spend the night. You're gonna accuse my husband of that? [¶] But Johanna doesn't do that, right. She's on damage control. She's trying to make this thing go away." Hence, after the trial court erroneously ruled that Johanna's motivation for directing Pangan to apologize was irrelevant, the prosecution compounded the error by arguing that Johanna must have been motivated by her knowledge of Pangan's guilt.

The exclusion of the proffered evidence thus allowed the prosecution to argue to the jury that Pangan only apologized because he was guilty, and that Johanna only directed Pangan to apologize because she knew he was guilty. The defense was unable to refute the prosecution's theory that his apologies were admissions of guilt by presenting evidence that Pangan was not silent when first confronted with the sexual assault accusation, and that he later apologized because his wife urged him to do so even if he was innocent. The defense was also unable to present evidence explaining why Johanna would have told Pangan to apologize even if she believed he was not guilty.

As Pangan argues on appeal, the trial court's rulings had the effect of allowing the jury to hear only part of the story regarding Pangan's alleged admissions of guilt. The jury heard that Johanna confronted Pangan with Vanessa D.'s sexual

assault allegation, but did not hear Pangan's response that the allegation should be investigated. The prosecutor then improperly relied on the exclusion of such evidence to argue that Pangan's purported failure to deny the allegation when confronted with it should be regarded as an admission of guilt. The jury also heard that Johanna told Pangan to apologize to Vanessa D., but did not hear that Johanna asked Pangan to do so even if he did nothing wrong to avoid police involvement and the possible impact on their children. At the first trial, the evidence of Johanna's complete statement to Pangan to apologize was admitted, and the jury was hopelessly deadlocked with five jurors voting to acquit. Under these circumstances, we conclude there is a reasonable probability that Pangan would have received a more favorable outcome at trial if the proffered evidence had been admitted. Accordingly, Pangan's judgment of conviction must be reversed and the matter remanded for a new trial.[8]

---

[8] In light of this conclusion, we need not consider Pangan's argument that the trial court improperly imposed fines and fees at sentencing without determining his ability to pay.

## DISPOSITION

The judgment is reversed and the matter is remanded to the superior court for a new trial consistent with this opinion.

NOT TO BE PUBLISHED.

KALRA, J.[*]

We concur:

EDMON, P. J.

LAVIN, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.